**STATE OF WEST VIRGINIA**

**SUPREME COURT OF APPEALS**

**WV DEPARTMENT OF HEALTH
AND HUMAN RESOURCES,**
**Employer Below, Petitioner**

**and**

**WV OFFICES OF THE INSURANCE COMMISSIONER,**
**Commissioner Below, Petitioner**

**vs.)   No. 20-0213** (BOR Appeal No. 2054733)
              (Claim No. 2000054175)

**RHODA J. HUGHES**
**Claimant Below, Respondent**

**MEMORANDUM DECISION**

Petitioner the WV Department of Health & Human Resources, by counsel Melissa M. Stickler, appeals the decision of the West Virginia Workers' Compensation Board of Review ("Board of Review").[1]

The issue on appeal is medical treatment. By Order dated January 2, 2019, the claims administrator denied an authorization request for an L2-3, L5-S1 facetectomy fixation fusion with removal and replacement of L3-5 hardware; preoperative care; a back brace; and a lumbar bone growth stimulator. The Workers' Compensation Office of Judges ("Office of Judges") modified the claims administrator's decision and ordered that authorization be granted for an L2-L3, L5-S1 facetectomy fixation fusion with removal and replacement of L3-L5 hardware and preoperative care. This appeal arises from the Board of Review's Order dated February 19, 2020, in which the Board affirmed the Order of the Office of Judges.

---

[1]A response was not filed.

1

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure.

The standard of review applicable to this Court's consideration of workers' compensation appeals has been set out under W. Va. Code § 23-5-15, in relevant part, as follows:

> (b) In reviewing a decision of the board of review, the supreme court of appeals shall consider the record provided by the board and give deference to the board's findings, reasoning and conclusions[.]
>
> . . . . (d) If the decision of the board effectively represents a reversal of a prior ruling of either the commission or the Office of Judges that was entered on the same issue in the same claim, the decision of the board may be reversed or modified by the Supreme Court of Appeals only if the decision is in clear violation of constitutional or statutory provisions, is clearly the result of erroneous conclusions of law, or is so clearly wrong based upon the evidentiary record that even when all inferences are resolved in favor of the board's findings, reasoning and conclusions, there is insufficient support to sustain the decision. The court may not conduct a de novo re-weighing of the evidentiary record. . . .

*See Hammons v. W. Va. Office of Ins. Comm'r*, 235 W. Va. 577, 775 S.E.2d 458, 463-64 (2015). As we previously recognized in *Justice v. W. Va. Office of Insurance Comm'r*, 230 W. Va. 80, 83, 736 S.E.2d 80, 83 (2012), we apply a de novo standard of review to questions of law arising in the context of decisions issued by the Board. *See also Davies v. W. Va. Office of Ins. Comm'r*, 227 W.Va. 330, 334, 708 S.E.2d 524, 528 (2011). With these standards in mind, we proceed to determine whether the Board of Review committed error in affirming the decision of the Office of Judges.

Ms. Hughes completed an Employees' and Physicians' Report of Occupational Injury or Disease form on April 22, 2000, regarding a work-related injury that occurred on February 1, 2000. She was injured when "she slipped and fell down wet stairs." The claim was held compensable for lumbosacral joint sprain on May 25, 2000. By Order dated August 16, 2005, the compensable components of the claim were updated to include lumbar spinal stenosis, thoracic/lumbar neuritis, lumbosacral sprain/strain, and lumbar disc displacement. Medical records indicate that Ms. Hughes previously underwent three lumbar surgeries after her compensable injury, two at L4-L5 and a third surgery to fuse L3 through L5. Ms. Hughes has been granted a total of 21% whole person impairment as a result of the February 1, 2000, compensable injury.

On December 1, 2009, Ms. Hughes underwent a spinal cord stimulator implant trial. The spinal cord stimulator treatment was unsuccessful, and she continued to have low back pain radiating into her lower extremity. On August 13, 2015, a lumbar spine x-ray showed status post posterior decompression fixation and interbody fusion at L3 through L5 with no acute osseous

abnormality. Ms. Hughes underwent an MRI of her lumbar spine on February 29, 2016, due to low back pain and bilateral leg pain with left leg numbness. The MRI revealed the following:

(a) Stable postsurgical change status post laminectomy and prior interbody fusion from L3-L5. There is no recurrent disc herniation or central or foraminal stenosis at L3-L4 or L4-L5;

(b) Mild enlargement of a broad-based disc protrusion at L5-S1 with moderately severe facet arthropathy and endplate spurring. There is moderate right and moderate left foraminal narrowing at L5-S1 without central stenosis. There is possible abutment of the right L5 nerve root;

(c) There is a small broad-based disc protrusion at L2-L3 with moderate facet arthropathy. There is mild left foraminal narrowing without central canal stenosis at L2-L3;

(d) There is a minimal grade 1 retrolisthesis of L2 on L3. No acute fracture.

Following her MRI, Ms. Hughes underwent an independent medical evaluation with Richard G. Bowman II, M.D., on February 13, 2017. Dr. Bowman performed a physical examination and noted that she was using a cane and walking with an antalgic gait. He opined that a request for epidural steroid injections at L5-S1 would not provide long term relief given that the injections were only six per year, and Ms. Hughes reports that in the past she had only experienced two weeks of pain relief after each injection. Dr. Bowman further opined that her reported cervical and left shoulder issues were not related to the February 1, 2000, injury. He did not feel that surgery was necessary in the claim, and he stated that if any other surgery would be needed, it would likely be surgery associated with L5 nerve compression. Dr. Bowman provided a March 1, 2017, letter to supplement his prior report to clarify that the epidural steroid injections in question were at the L5-S1 level and were not medically necessary since her lack of response to them in the past. He further opined that any future structural and/or physiological problems stemming from L3-4 or L4-5 should be construed as problems associated with unrelated degenerative changes.

On February 7, 2018, Ms. Hughes was referred to Dr. Bowman for a second opinion. She underwent a lumbar spine MRI, which revealed:

(a) Stable MRI of the lumber spine;

(b) There are postoperative changes from laminectomy, interbody fusion, and fixation at L3-L4, which are stable. No spinal stenosis or foraminal narrowing at these levels. Stable grade 1 anterolisthesis at L3-4;

(c) Moderate degenerative disc disease and facet arthropathy at L2-L3. Mild foraminal narrowing bilaterally. No spinal stenosis;

(d) Severe facet arthroplasty at L5-L1. Moderate right foraminal narrowing is stable.

After examination and a review of the June 7, 2018, MRI of the lumbar spine, Dr. Bowman opined:

> I reviewed her MRI and I agree that her primary problem currently is at L5/S1. The protruding disc at that level could be protruded due to adjacent disease or due to degenerative changes. She has not had any trauma or specific injuries that would lead me to believe that this was a condition due to adjacent segment disease. It is possible that the L5/S1 disc is protruded secondary to adjacent segment disease, but it is not probable. I would say that there is less than 50% chance that the disc is protruded secondary to adjacent segment disease and a greater than 50% chance that it is protruded secondary to natural degenerative changes.
>
> The L5-S1 level is consistent with the pain that radiates down her left leg to her foot.
>
> A repeat spinal cord stimulator trial is not medically necessary. I render this opinion because to my knowledge there is no definitive medical evidence that would specifically suggest that an individual who failed a tonic trial spinal cord stimulator has a greater than 50% chance of having a successful spinal cord stimulator trial with sub threshold programming. While there is significant literature to support the efficacy of sub threshold programming there is no definitive medical evidence that would specifically suggest that individuals who have zero relief of pain with tonic stimulation have a greater than 50% chance of success with sub threshold programming. The limited data that has been published has been based on small clinical series, most of which have been retrospective data.

Ms. Hughes saw William Zerick, M.D., a neurosurgeon, on June 18, 2018, for left leg pain. It was reported that the pain radiated through her lateral left leg to the top of her left foot. Dr. Zerick stated that her balance has worsened over time and she was ambulating with a cane. After reviewing the June 7, 2018, MRI, Dr. Zerick recommended an L2-L3 and L5-S1 decompression with fixation fusion. The recommendation for the L2-L3 and L5-S1 decompression with fixation fusion was because Ms. Hughes suffers from a decreased quality of life and residual weakness.

Based on the February 7, 2018, independent medical evaluation by Dr. Bowman, the claims administrator issued an Order on January 2, 2019, denying authorization requested by Mount Carmel Surgeons for L2-3, L5-S1 facetectomy fixation fusion with removal and replacement of L3-5 hardware; back brace; pre-op CBC, CMP, UA, PT/INR, PTT, EKG; and chest x-ray with bone growth stimulator. Ms. Hughes protested the claims administrator's decision.

Prasadarao B. Mukkamala, M.D., provided a Record Review report dated July 5, 2019. He reviewed the medical reports and diagnosed a lumbar sprain; status post L4-L5 discectomy; and status post L3-L4/L5-L5 fusion. Dr. Mukkamala disagreed with Dr. Zerick's interpretation of the July 7, 2018, lumbar MRI. Dr. Mukkamala stated that the MRI showed no changes from previous MRIs, and he did not believe an L2-L3 and L5-S1 decompression with fixation fusion was medically necessary. D. Mukkamala opined:

> Furthermore, if such a fusion is indeed indicated, it was not necessary to treat the compensable injury of 2/1/2000 . . . While the claimant may need further treatment with relation to non-compensable age-related degenerative lumbar spondylarthrosis, the claimant does not require any further treatment whatsoever with relation to the compensable injury of 2/1/2000.

Dr. Mukkamala also believed that Ms. Hughes was at her maximum degree of medical improvement.

On October 18, 2019, the Office of Judges ordered the claim administrator's Order of January 2, 2019, be modified to grant Ms. Hughes authorization for an L2-L3, L5-S1 facetectomy fixation fusion with removal and replacement of L3-L5 hardware and preoperative care. It was concluded that it had been proven by a preponderance of the evidence that the medical treatments were reasonably required for the injury of February 1, 2000. However, the Office of Judges determined that she has not proven that a back brace and lumbar bone growth stimulator are reasonably required for the compensable injury. The Board of Review issued an Order dated February 19, 2020, adopting the findings of fact and conclusions of law of the Office of Judges and affirmed the decision.

After review, we agree with the decision of the Office of Judges, as affirmed by the Board of Review. Dr. Zerick, a neurosurgeon, recommended surgery to treat Ms. Hughes's ongoing symptoms from her low back injury of February 1, 2000. The evidence of record documents an extensive history of treatment for her condition, and the Office of Judges determined that the request for surgery correlates with her symptoms. Therefore, the evidence supports that an L2-L3, L5-S1 facetectomy fusion fixation with removal and replacement of L3-L5 hardware and the preoperative care are reasonably required medical treatments for the injury received in the course of and as a result of her employment on February 1, 2000.

Affirmed.

5

**ISSUED: June 23, 2021**

**CONCURRED IN BY:**
Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton